# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00274-CV

---

**L. R. J. M., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF HAYS COUNTY
### NO. 19-1159, THE HONORABLE DAVID JUNKIN, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

L.R.J.M. ("Mother") appeals from the trial court's order terminating her parental rights to her daughter, "Cara," who was born in April 2017.[1]  As explained below, we will reform the trial court's order of termination and, as reformed, affirm the order.

### FACTUAL AND PROCEDURAL SUMMARY

In May 2019, the Texas Department of Family and Protective Services filed a petition seeking conservatorship of Cara.  The affidavit of removal explained that in March 2019, maternal grandmother "Wanda" had gone to visit Mother, Father, and Cara at their residence, which consisted of two recreational vehicles (RVs).  A house was on the property, but the allegation stated that "the parents do not always have access to enter the residence."  The RVs

---

[1] For the sake of the child's privacy and for clarity, we refer to the parents as "Mother" and "Father" and to the children and others involved by pseudonyms.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

had no plumbing, their toilets were clogged, "[b]uckets were used in place of toilets and the waste [was] thrown outside," and two-year-old Cara "was allowed to run around naked so that she can go to the bathroom as she pleased." With Mother's permission, Wanda took Cara home with her for about a month. In late April, Father demanded Cara's return, and two days later, the Department received a report that Mother, Father, and the paternal grandparents were abusing drugs, sometimes in front of Cara. The report said that all four were "using and snorting opiates" and smoking marijuana, that Mother was also abusing cocaine, and that the grandparents were allegedly selling prescription drugs from the home. The report further alleged that Mother "has been observed hitting and physically abusing [Cara] in the past," that Mother had thrown a bottle at the child, and that Cara "has been abused with bruising on her body."

A Department investigator found the family living in a small RV that was "dirty and unkempt with bags of trash located next to the play [pen]." The RV had electricity and a television but no running water or toilet, and the property around the RV "had discarded wood crates, a couch, a broken fan, a washing machine or dryer and a toilet with a black bag stuffed in it with the lid down." When the investigator spoke to Mother, she admitted that the RV had no running water and "had a mice problem." She also admitted that she smoked marijuana but said it was not while Cara was present. Father told the investigator that Mother had thrown a bottle at Cara, "causing bruises" on the child. He said that they slept in the RV because it had electricity, that they used the house to shower and cook, and that they no longer used the larger trailer because it was not hooked up to the septic system. The investigator stated that he believed Cara was in danger because of drug use by the parents, alleged physical abuse by both parents, and an unsafe physical environment, which he said was "not fit for someone her age."

In mid-May 2019, the trial court signed an order permitting the Department to remove Cara from her parents' care. In February 2020, the trial court signed an order finding that Father had demonstrated adequate compliance with the safety plan and ordering that Cara be placed back in his care. The court found that Mother had not made adequate progress and ordered that she could not have visitation until she started to engage in services and obtained approval from Cara's Court-Appointed Special Advocate (CASA).

A final hearing was held in April 2020.[2] The Department presented testimony by Department caseworker Will O'Brien, and a brief oral "report" of the CASA's opinion. Mother did not appear at the hearing, and her attorney said that she had not had contact with Mother since the February 2020 hearing. The Department also introduced into evidence Mother's July 2019 family service plan, a Status Hearing Order from July 2019, and records related to Mother's conviction in October 2019 for possession of a dangerous drug.

O'Brien testified that he had been the caseworker since November, about five months before the hearing. He explained that the Department had sought conservatorship because of "a report that there were unsafe living conditions" and an ensuing investigation that showed that Cara "was living in a trailer, which was—there's hazardous material laying around. There wasn't running water. It was unsanitary. It was unclean." He also noted allegations of physical abuse by Mother and drug use by both Mother and Father. O'Brien said Father had "successfully addressed all of the Department's concerns," demonstrated skills learned through his required services, tested negative for drugs throughout the proceeding after an initial positive test for marijuana, and obtained employment and safe and stable housing. Cara was "doing very,

---

[2] The trial was held via video conference due to COVID-19. *See* Second Amended Emergency Order Regarding COVID-19, Travis County Civil & Family Courts, Admin. File No. GN-61-121012, signed and filed May 7, 2020.

very well" with Father and appeared to be well bonded to him. She "cling[s] to Dad and she's very happy to be with him." She smiles and is happy to see him. When asked if she feels safe with Father, Cara indicated she does and gave "very big smiles." O'Brien had "no concerns with how she is doing" with Father and did not believe Cara would need therapy in the future: "To my knowledge, she is doing very well. I don't see therapy as necessary." O'Brien said Mother and Father were no longer in a relationship; that they had very little contact; and that Mother had reached out to Father "a few times," "strictly just for checking in on" Cara. He said that if Father was named sole managing conservator and Mother's parental rights were terminated, he trusted that Father would not allow Mother access to Cara.

As for Mother, O'Brien testified that she had not complied with the court-ordered service plan, which included requirements that she maintain safe and stable housing; abstain from drug use, criminal activity, and domestic violence; write a plan explaining "how she intends to provide for her family's needs as well as a budget"; seek temporary public assistance to ensure that she could meet her and Cara's basic needs; complete a protective parenting class and a nurturing parenting class; complete a drug and alcohol assessment; submit to random drug testing; participate in AA or NA meetings; complete a psychological evaluation; follow all recommendations from the evaluation; and inform the Department of her address, any arrests, any new relationships, and the like. O'Brien said Mother had not kept in contact with the Department or informed it of her address, completed a drug and alcohol assessment, or completed either of the required parenting classes. She failed to take any drug tests except one negative hair follicle test in February 2020 and did not provide proof that she had attended any AA or NA meetings. O'Brien also said that Mother did not develop a written budget, obtain safe and stable housing, or seek temporary public assistance or other financial help.

4

O'Brien testified that when he was assigned to the case, his "number one priority was getting [Mother] into an in-patient" program. At that time, Mother was "in a rehab facility" that "did not qualify as an in-patient," so O'Brien referred her to an in-patient program. She started that program in January 2020 but only "remained there for about two and a half weeks before she was kicked out" "for roughhousing and hitting another patient." O'Brien testified that Mother was homeless for a while and then entered a women's shelter, but she was again kicked out "because of—according to [the shelter]—falsifying to MHMR"[3] and trying to sneak a man into her room. O'Brien said, "I do not know where [Mother] has been since," and testified that the last time he had contact with her was at the February 2020 permanency hearing. Mother did not have a phone, and O'Brien thus could only contact her through her case manager or through the shelters in which she was placed. O'Brien testified that "as soon as she would leave a placement, she would be AWOL for me."

O'Brien testified that Mother had not had contact with Cara since his assignment to the case. In addition, Mother had only had two visits before O'Brien's assignment and had "not made active efforts to be involved in visitation." O'Brien was asked if Mother had ever called "to ask to speak to" Cara, and he said she had. He also explained that he had made plans for Cara to visit Mother at her in-patient program, "but that very week was the week that she was unsuccessfully discharged" from the program.

O'Brien said that he had concerns about Mother's mental health. However, he admitted, nothing "can be validated because she never went in for a psychological evaluation."

---

[3] MHMR stands for "Mental Health and Mental Retardation" and refers to organizations that provide mental-health services. *See, e.g.*, *Texas Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 32 (Tex. 2002); *Parsons v. State*, No. 03-19-00742-CR, 2020 WL 5099951, at *5 (Tex. App.— Austin Aug. 28, 2020, no pet. h.) (mem. op., not designated for publication).

His concerns arose from "the way that she would communicate. She seemed a little bit delusional at times and very sporadic. So, I have my personal concerns, but nothing that I can professionally verify."

O'Brien concluded his testimony by stating that he did not believe Mother had demonstrated an ability to provide Cara with a safe environment. He explained:

> My concerns for [Mother] are the very concerns that brought her into this case; maybe with a few additional. As I've spent time on this case, originally it was that she has not demonstrated that she can be a safe and protective parent in any capacity. Regarding her drug use; regarding being able to determine if she was physically abusive to her daughter. We have allegations of her hitting her daughter and throwing a water bottle at her daughter. And we've not been able to have any of this evaluated. We have personal concerns about her mental health, which we have not been able to evaluate because of the lack of a psychological evaluation. And I—I do have concerns, which may have been alleviated in a nurturing parenting class, of her being a nurturing parent. To me, she not only has not completed any services, but has not completed what I feel is a bare minimum to show that she would care enough for her daughter to make any substantial change. So, any of the original concerns, really, have only been heightened with a lack of any diligence in this case. Which was the hazardous living conditions [sic]. She has not had safe and stable housing. The drug use, which we've not been able to verify throughout this case. And also the physical abuse.

O'Brien further testified that he believed it was in Cara's best interest for Mother's rights to be terminated because:

> [Mother] has not been able to demonstrate that she is safe and protective, she has not been able to, in any way, validate that she can be a protective parent and non-abusive around [Cara] in the future. I don't believe that she has warranted any rights to her child after the duration of this case. With again, not demonstrating being safe and protective; and second of all, I would claim not being nurturing and caring for her daughter by putting her daughter's needs first above her own.

6

The CASA provided an oral report about her conclusions about Cara's best interests. She said that Father had "worked very diligently" to obtain housing and to satisfy the service plan's requirements, that there was a "very strong bond" between Father and Cara, and that "she does just want to be next to him." The CASA agreed that Mother's rights should be terminated because:

> She has not demonstrated that she has any desire to be a parent. You know, I think she actually tried to enter in-patient on three different occasions, and they were all failed attempts. I did get the opportunity to speak to her at the last court hearing. She was—she was fine with [Cara] going with her father. She had no concerns of him being able to, you know, care, you know, for—for her daughter. So, I'm in support with the Department's proposal of termination of Mom's rights and sole managing conservatorship to Dad.

After the hearing, the trial court signed an order finding by clear and convincing evidence that statutory grounds for termination existed and that termination of Mother's parental rights was in Cara's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O), (2).

## DISCUSSION

On appeal, Mother primarily attacks the trial court's best-interest determination. She contends that "[t]he entirety of the best interest testimony elicited by questioning of [the Department] at trial amounted to a mere 92 words," pointing to O'Brien's statement that he thought Mother's parental rights should be terminated because she had not demonstrated "that she is safe and protective," that she had not shown that she can be protective and "non-abusive" to Cara, and that she had not put Cara's needs above her own. However, although O'Brien was not asked to explain his conclusions any further, his opinion was more fully explained in his other testimony—concerns that Mother had not completed a psychological evaluation, despite

7

O'Brien's concerns that she sometimes seemed "delusional" or "sporadic"; her inability or unwillingness to complete a treatment program, including being kicked out of an in-patient program and a shelter for breaking the facilities' rules; her inability to obtain safe and stable housing; her failure to maintain contact with the Department; her lack of contact with Cara, caused primarily by her failure to make progress on her service plan; her failure to take drugs tests throughout the proceeding except for one test taken about two months before the final hearing; and her overall failure to make any substantive progress on her safety plan, to maintain a relationship with Cara, or to show herself willing to place Cara's needs before her own. The CASA reported similarly, opining that Mother had not shown an interest in being a responsible, safe parent for Cara and saying that Mother was content for Cara to remain with Father.

We consider a trial court's finding on best interest in light of the factors set out in *Holley v. Adams*: the child's wishes, if appropriate given the child's age; her emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the child's best interest; plans for the child's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

There was sufficient evidence from which the trial court could have reached a firm conviction as to its best-interest determination. And contrary to Mother's assertion, the record does not indicate that Cara was removed because of her parents' poverty. Cara was not removed because the family lived in a small trailer but because the RV lacked plumbing and running water, was unsanitary (including bags of trash sitting next to the play pen), and was surrounded by dangerous debris. In addition, there were allegations that Mother and Father posed a danger to Cara in the form of physical abuse, a dangerous living situation, and drug use. Mother did not take steps to address those concerns, such as by taking either required parenting class, seeking assistance that would allow her to secure a safe living environment, completing a drug and alcohol assessment, taking requested drug tests, or completing a psychological evaluation and following any recommendations. Mother was kicked out of at least one in-patient program and out of the women's shelter, both times due to her unwillingness or inability to follow the facility's rules. She did not maintain contact with the Department, did not make efforts to be able to have visitation with Cara, and did not prepare the plan and budget that might indicate an ability to care for Cara. Finally, she did not maintain contact with her lawyer after the February 2020 hearing or appear for the final hearing.

Father worked through his required services, tested negative for drug use, obtained employment, and obtained a safe place for Cara and himself to live. Although the Department did not introduce any evidence about four-year-old Cara's wishes, evidence showed that she was bonded with Father and felt happy and safe in his care. *See P.C. v. Texas Dep't of Fam. & Protective Servs*., No. 03-16-00784-CV, 2017 WL 2062270, at *2 (Tex. App.—Austin May 10, 2017, no pet.) (mem. op.) (when child is too young to express desires, courts may consider quality and extent of child's relationship with proposed placements); *see also In re*

9

*D.A.B.*, No. 04-19-00629-CV, 2020 WL 1036433, at *7 (Tex. App.—San Antonio Mar. 4, 2020, no pet.) (mem. op.) ("When a child is too young to express her desires—as D.A.B., who was three years old at the time of trial, is—the trial court may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with the parent.").

Mother asserts that the fact that O'Brien did not believe that Cara would need therapy and was "fine" living with Father means that Cara's emotional and physical needs in the future should be considered neutral or even in Mother's favor. She makes a similar argument as to any danger posed to Cara now and in the future, arguing that because Cara had been placed with Father, who no longer had a relationship with Mother, the factor "at worst is neutral, and perhaps more reasonably, weighs in favor of preservation of [Mother's] parental rights." However, we conclude that the trial court could reasonably have found that these factors weigh in favor of termination because the evidence indicated that Mother could not meet Cara's emotional and physical needs and could pose a danger to Cara in the future because of Mother's failure to obtain a stable living environment, learn better parenting skills, and address any mental health concerns. The fact that Mother did not seek physical custody of Cara does not preclude the trial court from considering whether she might pose a danger to Cara now or in the future or whether she could meet Cara's needs now or in the future.

Mother also argues that we should weigh neutrally or in her favor the factor related to programs available to assist her in promoting Cara's best interest because of evidence that she had "at the very least, accessed one course of 'rehab' treatment" and that there was "substantiated interaction" with MHMR. However, the only reference to MHMR was O'Brien's statement that Mother was kicked out of the women's shelter, in part, for "falsifying to MHMR." There is no explanation in the record about what that means, much less whether it means Mother

10

had any meaningful contact with MHMR. Further, the evidence shows that Mother was kicked out of the in-patient program because of her rule-breaking, did not seek public assistance, did not take parenting classes, and did not complete a psychological evaluation. This factor, therefore, weighs squarely in favor of termination.

As for Mother's parenting skills, the only evidence in the record weighs against her. Mother was alleged to have thrown a bottle at Cara, and she admitted to the Department investigator that she used marijuana, although not in Cara's presence. Mother did not take parenting classes that might have weighed favorably on this factor, had only two visitations during the almost two years Cara was in the Department's care, and had a third planned visit canceled because she was kicked out of the in-patient program the week the visit was scheduled. Further, Mother's lack of progress with her required services meant she had almost no contact with Cara for two years of the child's four years of life.

Mother did not present evidence about her plans for Cara, as compared to the Department's plan to terminate her parental rights and have Father named sole managing conservator. Given the absence of information about Mother's current situation, much less her plans if she retained her parental rights, and considering the Department's planned placement with Father, a comparison of plans weighs slightly in favor of termination. Finally, Mother presented no evidence about her living situation, whether or why she was homeless, whether she was employed, or why she had allowed Cara to live in a dirty, dangerous environment at the time of removal. We thus have no evidence to weigh in her favor when considering any excuses for her conduct and circumstances.

This record includes evidence that Mother had abused Cara, allowed her to live in a dangerous physical environment, was arrested for and convicted of possession of a dangerous

drug while the case was pending, was at times homeless, was kicked out of an in-patient program and a shelter for breaking rules, sought little contact with her daughter, failed to complete the required services on her service plan, and did not maintain contact with the Department or her own attorney; therefore no evidence weighed in Mother's favor. *See In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.). We hold that the evidence is sufficient to support the trial court's finding that termination of Mother's parental rights was in Cara's best interest. *See, e.g.*, *In re L.A.M.*, 545 S.W.3d 579, 586 (Tex. App.—El Paso 2016, no pet.) (although mother's circumstances were not entirely "of her own making," there was evidence she had endangered child in past and might do so in future, mother did not take advantage of offered programs, and her future plans were "too uncertain to require the trial court to find that she can provide stability and financial support for the child"). We overrule Mother's challenge to the court's determination of best interest.

Mother also complains that although the Department requested termination only under paragraphs (N) and (O), the trial court also found grounds under paragraphs (D) and (E).[4] We sustain this complaint. The reporter's record indicates that the Department argued only that termination was proper under (N) and (O), asserting as support that Mother "has not completed any of her court ordered services; she has failed to complete in-patient as ordered; and she's really not done anything in this case to—to warrant her being the parent to this child." Father's attorney agreed that "the (o) grounds and the (n) grounds be what—the grounds that she's terminated on" and asked that Father be appointed Cara's sole managing conservator. The

---

[4] Mother's brief recites that her "sole issue" was challenging the best-interest determination. However, the last two pages of her brief argue this issue, set out under its own heading. Further, Mother's prayer section includes a general request for all relief to which she is entitled. Thus, although the Department's brief does not address it, the issue is fairly before us.

Department thus did not seek termination based on the (D) and (E) grounds at trial, and it was error for the trial court to find that Mother's rights should be terminated under the (D) and (E) grounds as well. Because paragraphs (D) and (E) can have collateral effects on Mother's relationships with children she might have in the future, *see* Tex. Fam. Code § 161.001(b)(1)(M) (providing as statutory ground that parent had her rights to another child terminated "based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state"), we reform the order to delete the court's findings of grounds under paragraphs (D) and (E).

## CONCLUSION

We have overruled Mother's challenge to the trial court's finding of best interest. Because at trial the Department limited its request for termination to paragraphs (N) and (O), we reform the trial court's order of termination to delete its findings of statutory grounds under paragraphs (D) and (E). We affirm the trial court's order as reformed.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Baker and Kelly

Reformed and, as Reformed, Affirmed

Filed: October 15, 2020

13